**AMERICAN SAMOA CABLEVISION, Plaintiff**

**v.**

**AMERICAN SAMOA POWER AUTHORITY, Defendant.**

High Court of American Samoa
Trial Division

CA No. 51-00

June 29, 2000

Before RICHMOND, Associate Justice, SAGAPOLUTELE, Associate Judge, and TAUANU`U, Temporary Associate Judge.

Counsel: For Plaintiff, Charles V. Ala`ilima
 For Defendant, Roy J.D. Hall, Jr.

### OPINION AND ORDER

This dispute arose out of a 1995 agreement between plaintiff American Samoa Cablevision ("ASCable") and defendant American Samoa Power Authority ("ASPA"). This agreement, entitled Agreement for Joint Use of Electric Poles ("the pole agreement" or "the agreement"), provided for ASCable to share the use of ASPA's utility poles by attaching its cable lines to the poles.

ASCable filed a claim against ASPA for declaratory relief in order to require ASPA to submit to binding arbitration on the proper rental amount, and for an injunction to prevent a declaration of breach by ASPA and to prevent ASPA from taking action against ASCable's cable lines. ASPA filed a counterclaim, alleging alternatively that the contract is void, making ASPA entitled to reasonable rental fees, and that ASCable breached the rental contract. ASPA seeks both a declaratory judgment and judgment for breach of contract.

ASCable requested a preliminary injunction, and the hearing on the injunction was combined with trial. Trial then proceeded, with attorneys for both parties present, on May 2, 2000.

## I. Contract Validity

ASPA first argues that its executive director, Abe Malae, did not sign the pole agreement and that Malae's signature stamp was used in place of his actual signature, rendering the agreement invalid. Malae stated in an affidavit that he has no independent recollection of signing the agreement, and that the signature on the agreement looks like his signature stamp.

The Court has compared a copy of the signature stamp to the signature on the various versions of the signature page of the pole agreement that have been filed with the Court.[1] The signatures on these signature pages do not appear to match Malae's signature stamp. Malae's failure to specifically recollect signing the agreement five years ago does not necessarily indicate that he did not sign it. Furthermore, by demanding payment in accordance with the agreement and not questioning the agreement's validity for the past five years, ASPA has acted as if the agreement were valid, indicating a likelihood that the agreement was signed by its executive director. We therefore find that Malae signed the pole agreement.

ASPA also argues that the pole agreement is invalid because it was not approved by ASPA's attorney, Marshall Ashley, as required by ASPA's Procurement Regulations Rule 10.0311. Two of the signature pages filed with the Court were signed by Ashley, although his signature was not on every version. It is unclear, therefore, whether Ashley signed a final version of the agreement. However, it is clear that Ashley approved some version of it very close to the final version, and therefore approved it as to legal sufficiency. At any rate, the Court fails to see why ASPA's failure to obtain its attorney's signature renders the agreement invalid. Two parties with either actual or apparent authority to enter into a contract signed the agreement. ASCable should be able to rely on the validity of a contract signed by ASPA's executive director.

---

[1] Several versions of the pole agreement have been filed with the court. One was filed by ASCable with its complaint, which was also submitted as Exhibit 1 at trial, one was filed by ASPA with its opposition to injunctive relief, and another was filed by ASPA as Exhibit 7 at trial. All versions appear to be very similar in substance. In addition, a signature page was filed with ASCable's May 2, 2000 memorandum. It appears that there are multiple versions of the agreement and signature page because the parties signed faxed copies of signature pages as well as multiple original copies of the agreement because not all parties were on-island.

## II. Breach of Contract

Both ASCable and ASPA allege that the other party has breached the pole agreement based primarily on different interpretations of Article IX, paragraph (c) of the agreement. Article IX, paragraph (c) of the agreement reads, in relevant part:

> The parties hereto have agreed to sign this Contract using a One and 00/100 Dollars ($1.00) per pole per month Rental Rate. The owner, however, has agreed to review the Pole Rental Rate for a possible reduction in the Rental rate charged Licensee. In no event, however, will the rate exceed One and 00/100 Dollars ($1.00) per pole per month. If, after making its review of the Rental Rate, the Owner and Licensee are unable to reach an agreement on the Rental Rate for the Poles, the Parties hereto have agreed to submit the Pole Rental Rate to binding arbitration. . . . The Rental Rate for the Poles as so determine[d] shall be substituted for the One Dollar ($1.00) per month per pole.

The provision allowing for a change in price was apparently included in the agreement because the parties were having difficulty finalizing price, but wanted to proceed with the project.

The parties entered into the pole agreement on or about January 25, 1995. Soon thereafter, ASPA began a project to remove its power lines from the poles and place them underground. ASCable did not participate in that project at that time and proceeded to use the poles for its cables.

### A. ASCable's Failure To Pay Full Amount

Under the pole agreement, payment for both 1995 and 1996 were due simultaneously at the end of 1995. ASCable believed that a reasonable rental rate was 30 cents per pole, and in May of 1996, ASCable paid ASPA $6,512.40 for the use of 1,206 poles at 30 cents per pole for 18 months, comprising six months in 1995 and all of 1996. ASPA accepted payment of this amount as a partial payment, but continued to demand payment at the one dollar per pole rate, totaling $21,708. ASCable has not made another payment to date. According to ASPA, ASCable has breached the agreement by failing to pay one dollar per pole per month as stated in the agreement.

At some point, ASPA reviewed the pole rental rate and determined that the reasonable rental rate exceeded one dollar per pole per month. ASPA nonetheless decided that it would accept one dollar per pole in accordance with the pole agreement. ASPA submitted its assessment to ASCable in September 1996.

By the unambiguous terms of the pole agreement, payment of one dollar per pole per month for the years 1995 and 1996 was due at the beginning of 1996. Although the contract allowed for a reduction in price, the price to be paid was one dollar unless and until the price changed. The renegotiation and arbitration clauses were not conditions precedent to ASCable's agreement to pay. By failing to pay one dollar per pole when it came due and failing pay anything for five months, ASCable was in material breach of the agreement unless ASPA had already breached the agreement by failing to submit to arbitration, which might prevent ASCable's performance from coming due.

## B. ASPA's Failure to Submit to Arbitration

According to ASCable, ASPA is in breach of the pole agreement for failing to abide by the clause in the agreement that provides for binding arbitration in the event that the parties are not able to agree on a rental rate. ASPA argues that it was only required to submit to binding arbitration if it determined that the contract price was to be greater than one dollar per pole. In support of this interpretation, ASPA argues that it would be redundant for Article IX, paragraph (c) to state both that ASPA would consider a possible reduction and that the rate will not exceed one dollar per pole. To avoid this redundancy, ASPA argues that the words "possible reduction" should be read to mean "possible adjustment". Under this interpretation, ASPA would only be required to submit to arbitration if it wanted to adjust the price above one dollar and ASCable objected.

■ In choosing between reasonable interpretations of a contract, the court will construe the contract against the drafter. *Am. Samoa Gov't* ex rel. *Uikirifi v. Hawaiian Airlines, Inc.*, 10 A.S.R.2d 31, 38 n.3 (Trial Div. 1989). In this case, it appears that both parties were involved in creating the pole agreement. ASCable drafted the agreement, but it did so from a form provided by ASPA. The primary reasons for construing contracts against the drafter, that the drafter is more likely to protect his or her own interests and to know of uncertainties of meaning, RESTATEMENT (SECOND) OF CONTRACTS, § 206 (a) (1982), do not apply in this case because both parties were involved choosing the language of the agreement. It would therefore be inequitable to construe the agreement against ASCable on the basis of drafting.

■ At any rate, we find ASPA's construction of the pole agreement unreasonable. The redundancy ASPA speaks of merely emphasizes the parties' understanding that the pole rate would not exceed one dollar per pole. We will not reword a contract provision that is clear both on its face and when read in context. ASPA's construction goes against the language in the agreement, which states that the parties will submit to binding arbitration if they cannot agree on a rental rate after ASPA had

203

reviewed the rental rate for a possible reduction.

■ The pole agreement did not indicate a time frame by when ASPA would review the rental rate and by which the parties would submit to binding arbitration. When a contract states no time frame for performance, the court will imply a reasonable time. *Hodges v. Pa. Millers Mut. Ins. Co.*, 673 A.2d 973, 974-975 (Pa. 1996); RESTATEMENT (SECOND) OF CONTRACTS, § 204(d) (1982). Only an unreasonable delay constitutes a material breach. *Kleller v. Hummel*, 334 N.W.2d 200, 203 (N.D. 1983).

We have little information from which to determine what would constitute a reasonable amount of time for ASPA to perform since there was not testimony on this issue. ASPA did not provide ASCable with its assessment of reasonable rates until September 1996, approximately 21 months after the parties entered into the agreement. However, the relevant question is whether it was unreasonable for ASPA to have not performed at the time ASCable's rental payment became due in December 1995.

With the information available to us, we cannot find that ASPA's delay was unreasonable. There is no way for the Court to know what is involved in determining a fair rental rate under these circumstances. ASCable seems to have believed that the issue of rental payments would be resolved by the time they had to pay for 1995 and 1996, but the pole agreement did not set such a time frame. ASCable has submitted no evidence on the subject, such as testimony about what constitutes a reasonable time for determining a rental rate, or correspondence from ASCable to ASPA requesting the rate assessment before its payment came due. There is nothing, other than the length of time itself, to even suggest that the time was unreasonable. ASPA was therefore not in breach for its failure to submit to arbitration when ASCable's first payment was due at the end of 1995.

C. Accord and Satisfaction

■ Although ASCable failed to pay the full amount due for 1995 and 1996, ASPA effectively waived ASCable's breach and an accord and satisfaction operated to alter the parties' pole agreement. For an accord and satisfaction to discharge an existing debt, there must be: (1) a good faith dispute over the amount of an unliquidated claim, (2) substituted performance that is tendered and accepted, and (3) valuable consideration for the agreement. *Baum's Dairy Farms, Inc. v. United States*, 996 F. Supp 705, 711 (E.D. Mich. 1998).

■ In ASCable's May 21, 1996 letter that accompanied its 30 cents per pole payment to ASPA, Neil McKay, ASCable's Managing Joint

Venturer, indicated that ASCable was submitting a good faith payment on the rental rate, indicating that ASCable believed 30 cents to be a fair rental rate. As discussed *supra* at II.A, ASCable owed one dollar per pole for 1995 and 1996. However, "[i]f there is a reasonable basis for a good faith dispute as to the amount of a debt, that dispute may be settled by an accord and satisfaction, even where the claim or defense giving rise to the dispute was invalid." *Kent Samoa v. Shimasaki*, 27 A.S.R.2d 140, 142 (Trial Div. 1995) (citing RESTATEMENT (SECOND) OF CONTRACTS § 74, cmts. b & c, & ill. 4 (1982)). Although ASCable was incorrect that it owed ASPA less than one dollar per pole, it had a good faith belief that the proper rental rate was 30 cents, and that it owed either 30 cents or an amount to be determined by arbitration. Thus, whether the proper rental rate was 30 cents, one dollar, or something in between, was a matter of good faith dispute.

 A party offered an accord has no duty to accept substituted performance, but the acceptance of performance in the disputed amount operates to discharge the duty, despite a declaration of not assenting to the condition that payment is payment in full. RESTATEMENT (SECOND) OF CONTRACTS § 278(1) & cmt. a (1982). Acceptance of partial payment as payment in full, despite a statement that it is accepted only as partial payment, constitutes acceptance of a substituted performance. *Rhone v. State Auto Mut. Ins. Co.*, 858 F.2d 1507, 1510-11 (11th Cir. 1988). ASPA's acceptance of the 30 cent per pole payment, despite its accompanying letter that it was accepting it as only partial payment, therefore constituted `acceptance of the substituted performance. Furthermore, despite the fact that ASCable's payment was late, ASPA could not accept payment and also claim a default. *May Centers, Inc. v. Paris Croissant of Enfield Square, Inc.*, 599 A.2d 407, 410 (Conn. 1991). Its acceptance of the rent, therefore, operated as a waiver of ASCable's breach. *Id.*

In ASCable's May 1996 letter, it cited the pole agreement clause that allowed for ASPA to submit a proposed rate and allowed for arbitration if the parties could not agree, indicating that it was willing to submit to these provisions if ASPA did not agree to ASCable's 30 cent assessment. ASCable's payment was thus intended as payment in full, while still leaving ASPA the option of submitting a proposed alternative amount and submitting to binding arbitration if the parties disagreed on ASPA's suggested rental rate. Binding arbitration is now necessary to determine the fair rental rate for 1995 and 1996.

D. Summary of Legal Findings

1. ASCable was in breach of the pole agreement with ASPA for its failure to pay the agreed rental amount of one dollar per pole when it came due.

2. ASPA did not breach the pole agreement in failing to submit to arbitration.

3. There was an accord and satisfaction on the parties' pole agreement, insofar as it involved the years 1995 and 1996.

4. ASPA waived ASCable's breach by accepting rent from ASCable.

5. By accepting ASCable's 30 cent per pole payment, ASPA accepted payment in full for 1995 and 1996, except that ASPA could still submit a proposed alternative amount and submit to binding arbitration on the proper amount of payment.

## III. Modification By Swap of Infrastructure

A. <u>Factual Background</u>

In the September 1996 letter from Perelini Perelini, Acting Executive Director of ASPA, to Charles Ala`ilima, General Manager of ASCable, in which ASPA provided its analysis of the proper rental rate, Perelini suggested the following:

> To resolve this issue of non-payment, ASPA proposes that ASC enter into an agreement and immediately carry through with a swap of infrastructure. ASPA offers to allow use of all ASPA poles for a period of one year, at no charge in return for ASPA['s] use of dark fibers between ASPA Wide Area Network members for the same period.

There is no written contract finalizing an agreement on this issue.

Nonetheless, ASCable did allow ASPA to use its fibers between ASPA's Wide Area Network members.

In July 1999, ASPA entered into an agreement with American Samoa Telecommunications Authority ("ASTCA") for ASPA to provide access to its underground conduit to ASTCA. This agreement allowed ASTCA to place fiber optic lines in ASPA's conduit, and also provided for ASTCA to supply fiber optic lines for ASPA's computer network. After this agreement was effectuated, ASPA no longer needed ASCable's fiber optic lines.

ASPA used ASCable's fibers until sometime in 1999, when the ASPA/ASTCA agreement went into effect, and also did not again request payment on the pole agreement until 1999.

206

B. Implications of Fiber Use

ASCable believes that Perelini's letter and the parties' subsequent actions indicate that ASCable and ASPA agreed to offset the pole rental with fiber access. ASPA argues that there was no formal, written agreement between the parties that allowed for an offset, and because there has been no modification to the pole agreement, ASCable is still bound to pay one dollar per pole for the years it has been using ASPA's power poles.

 There was no final written agreement modifying the pole agreement. However, a written agreement may be modified by oral agreement. *Piatt's Admr. v. United States*, 89 U.S. 858, 861 (1875). An unwritten modification is enforceable when it has been acted upon by the parties so that it would be an injustice or fraud to refuse to carry it out. *Canada v. Allstate Ins. Co.*, 411 F.2d 517, 519 (5th Cir. 1969). Here, the swap of infrastructure took place, and the parties acted for several years as if there were a contract. ASPA used ASCable's fibers, and no longer requested payment on the pole agreement. The parties' actions, therefore, manifested their assent to orally modify the agreement, and they are estopped to deny its validity.

From the letters between the parties, it is clear that the parties intended the modification to tie in with the original pole agreement. Two documents, a memorandum from Ken Knoche of ASCable to Robert Morrell of ASPA on September 19, 1996, and a letter from Robert Morrell to Ken Knoche on November 1, 1996, state that ASPA and ASCable will agree to the values of the data transportation, also referred to as the fiber access, and the pole rental, and will "arrange a mutually agreeable 'exchange of checks' to provide payment." According to these letters, the term of the agreement was to be concurrent with the pole agreement, and was to run from December 1, 1996 to November 30, 1997.

There is no indication that the parties ever formally agreed to a price for the offset, and they neither requested nor demanded payment while the swap of infrastructure continued. The value of the pole rental is to be determined in binding arbitration, as indicated above. To calculate the amount of the offset under the modified agreement, it is necessary to determine the value of the fiber access, as well. The issues in binding arbitration shall therefore also include determination of the value of the fiber access.

**Order**

1. ASCable and ASPA shall submit to binding arbitration to determine a fair rental rate for ASCable's use of ASPA's power poles, and shall also

submit to binding arbitration to determine a fair rate for ASPA's access of ASCable's fibers.

2. ASCable shall pay to ASPA 30 cents per pole per month from the date of ASPA's discontinuing the use of ASCable's fibers until the present. ASCable shall then continue to make payment at 30 cents per pole, at the times indicated in the pole agreement, for as long as the parties continue with the pole agreement. The 30 cents per pole rate shall be replaced with the arbitrated amount as soon as arbitration is complete.

3. For the period comprising 1995 and 1996, and for the period after ASPA discontinued using ASCable's fibers, ASCable shall pay ASPA the difference between the arbitrated amount and the 30 cent amount, once arbitration is completed.

4. For the time during which ASPA used ASCable's fibers, ASCable shall pay to ASPA the difference between the 30 cent price and the arbitrated price, minus the amount of offset for ASPA's fiber use, once the arbitration is completed. If this number is negative, however, ASPA shall pay to ASCable the amount of offset for its fiber use, minus the difference between the 30 cent price and the arbitrated price.

It is so ordered